[No. 42595-1-I.    Division One.    December 13, 1999.]

TERRY RAYMOND, ET AL., *Appellants*, v. PACIFIC CHEMICAL, ET AL., *Respondents*.

740

*A. Richard Maloney*, for appellants.

*Ralph Crockett Pond* of *Lane Powell Spears Lubersky, L.L.P.*, for respondents.

COLEMAN, J. — Terry and Carmella Raymond appeal the dismissal of their wrongful discharge claims against Terry Raymond's employer, Pacific Chemical, and his managers and supervisors. The Raymonds contend that the trial court erred in dismissing their claims based on Terry's reliance on provisions in an employee handbook and Pacific Chemical's assertion of a noncompetition covenant following Terry's termination. They also contend that the trial court erred in dismissing their discriminatory discharge claims against Terry's Pacific Chemical supervisors. We affirm.

## FACTS

Terry Raymond was a sales representative for Pacific Chemical, a division of Pace International, L.P., from 1973 to 1977, 1980 to 1982, and 1992 to 1996. In May 1992, Terry was working as a sales representative for Wesmar, a Pacific Chemical competitor, when Pacific Chemical rehired him by offering him the opportunity to increase its sales in Alaska.

On his return to Pacific Chemical in 1992, Terry signed a "Salesman Agreement" that set forth the employment relationship between the parties. The agreement states:

As part of my application for employment with Pacific Chemical, hereinafter called "Company," as a salesman and/or trainer of salesmen, I achknowledge [sic] that I have been advised of the terms of employment which follow.

If I am employed, in consideration of said employment, I agree to these terms:

. . . .

10. That my employment hereunder is terminable at the will of either the Company or myself.

Shortly thereafter, Terry received a handbook describing the company's policies and benefits, which was issued to all employees of Pace International. A second edition of the handbook, substantially unchanged, was issued to Pace employees in February 1994. The handbook's introduction

refers to employees' "rights and . . . responsibilities while employed at Pace." Under the heading "PROBATION AND TERMINATION," the handbook contains the following provision:

> Prior to discharge, other than for reasons of severe breaches of discipline, an employee will be advised in writing that an unsatisfactory condition exists and be given a reasonable and definite period of time to clearly demonstrate improvement.

> If the warning does not produce satisfactory performance within the period designated in writing, the employee may be discharged.

In July 1996, shortly before Terry left on a planned vacation, he was told that the company was reassigning him from the southeast Alaska sales region to a region in Seattle. Terry was also notified that the company was changing the way in which he would be compensated. Previously, Terry had received commissions on his sales and a guaranteed minimum salary of $3,900 per month, resulting in earnings of approximately $66,800 in 1995. Under the new compensation plan, Terry would receive a base salary of approximately $54,720, a stipend for gas, and bonuses that reflected his sales performance. Although Pacific Chemical asserted that the new plan did not represent a substantial change in Terry's compensation, Terry believed that the company had conditioned the bonuses on unrealistically high levels of performance and that the new plan would result in a substantially reduced salary.

Pacific Chemical terminated Terry five weeks after he returned from vacation, citing his attitude toward the company and its managers and insubordination regarding his reassignment. In a formal statement identifying the reasons for dismissal, the company indicated that it considered Terry's behavior to be severe breaches of discipline that warranted termination as outlined in the Pace International handbook. Pacific Chemical subsequently asserted that there were several problems with Terry's job performance, attire, reports to the company, and interac-

tion with customers and co-workers. Terry later admitted in a deposition that he had complained to his Alaska clients that the reorganization of the sales territories was a mistake and would affect the company's ability to provide service and respond to customers' safety concerns.

After Terry was terminated, Wesmar offered to rehire him to solicit orders from his old Pacific Chemical accounts in Alaska. Although Terry's 1992 employment agreement contained a noncompetition covenant, Terry initially received reassurances that Pacific Chemical would not prevent him from working for Wesmar. But after the Raymonds sought additional compensation for Terry's discharge, Pacific Chemical threatened both Terry and Wesmar with litigation to enforce the covenant.

The Raymonds sued Pacific Chemical and Richard Hunter, Glen Gay, William Boring, and Phil Ward, Terry's supervisors at Pacific Chemical and Pace, alleging that Terry's termination violated provisions in the employee handbook and was part of a plan to terminate older sales representatives. The Raymonds also contended that Pacific Chemical's threat to enforce the noncompetition covenant constituted tortious interference with a business expectancy, and they sought a declaratory judgment finding that the restrictive covenant was invalid.

The defendants moved for summary judgment on all claims. The trial court granted the motion with respect to all claims except the Raymonds' age discrimination claim against Pacific Chemical, which the Raymonds later voluntarily nonsuited. The court further ruled that in light of its dismissal of the remaining claims, it need not reach the issue of the noncompetition covenant's validity.

## DISCUSSION

### Nonconforming Declarations

At oral argument on the summary judgment motions, the Raymonds moved to strike all evidence submitted by the defendants in support of the motions, arguing in part

that the declarations of Glen Gay, Richard Hunter, William Boring, and Phil Ward did not conform to RCW 9A.72.085 and the civil and general rules.[1] None of the declarations were declared under penalty of perjury and under state law, and none stated the place of execution. The court declined to consider the motion, indicating that it was not timely. The Raymonds contend that the court erred in failing to strike the declarations.

■ ■ A trial court may not consider inadmissible evidence when ruling on a summary judgment motion. *King County Fire Protection Dist. No. 16 v. Housing Auth.*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994). But if the documents supporting the motion do not conform to the requirements of the rules, the opposing party must file a timely motion to strike the documents. *Burmeister v. State Farm Ins. Co.*, 92 Wn. App. 359, 365, 966 P.2d 921 (1998); *Meadows v. Grant's Auto Brokers, Inc.*, 71 Wn.2d 874, 881, 431 P.2d 216 (1967). The court's ruling on a motion to strike is discretionary. *Burmeister*, 92 Wn. App. at 365.

Here, the Raymonds did not move to strike the nonconforming declarations until oral argument on the summary judgment motions. In addition, before judgment was entered, the defendants submitted amended declarations that were identical in content and that complied with the statutory requirements. Thus, there is no indication that the trial court improperly relied on inadmissible testimony in ruling on the summary judgment motions. We conclude that the trial court did not err in refusing to consider the motion to strike.

Employee Handbook Claim

The Raymonds next contend that Terry's termination violated the provisions governing probation and termination in the Pace International handbook notwithstanding

---

[1] CR 56(e) requires that affidavits submitted in support of or opposing a summary judgment motion set forth facts that would be admissible in evidence. GR 13(a) and RCW 9A.72.085 provide that an unsworn declaration may be submitted in place of an affidavit if the document recites that it is declared by the person to be true under penalty of perjury and under state law, states the date and place of its execution, and is subscribed by the person.

the terms of his employment agreement, which provided that his employment was terminable at will. They first contend that the defendants improperly submitted a copy of the agreement to the trial court and failed to establish the document's authenticity. In support of their argument, the Raymonds note that the defendant's copy of the agreement is dated May 11, 1992, but Terry's terms of employment for that year refer to an agreement completed on April 28, 1992.

We find that these contentions are without merit. In a deposition, Terry testified that he recognized the document and confirmed that he signed it when he was rehired by Pacific Chemical in 1992. Terry identified the document as "a Pacific Chemical salesman's agreement" and verified his signature at the end of the agreement. He testified that he did not remember when he executed the agreement, but acknowledged that he signed it after he was rehired from Wesmar.

Q. [Y]ou described the circumstances under which you were persuaded to return to Pacific Chemical by Brooke Van Wyk when you were working at Wesmar. Do you remember that?

A. I do.

Q. Do you recall any discussions with anyone at Pacific Chemical regarding the execution of this Pacific Chemical salesman agreement as part of the deal you cut at that point?

A. Yes, I do.

The Raymonds also contend that the terms of the agreement applied only to Terry's first year of employment. The agreement states:

If I am employed, in consideration of said employment, I agree to these terms:

. . . .

2. That the following compensation, in addition to the com-

missions earned by me, shall be paid only for the period hereinafter set forth and provided further that I am employed by the Company during the period indicated:

5-11-92 to 5-10-93

Guarantee as per Terms of Employment—

If Terry remained employed during the first year of employment, this provision guaranteed him a minimum salary in addition to his commissions. The remaining terms in the agreement, however, are not similarly limited. The agreement refers broadly to Terry's "terms of employment." The other provisions in the document set forth the company's policies on the compensation for sales employees, the basis upon which commissions are paid, record keeping, the authorization of sales and credit transactions, and the employee's obligations. These provisions set forth the employment relationship between the parties, and it is clear from the language of the agreement that the parties intended these provisions to apply throughout their employment relationship.

■ The Raymonds next contend that the Pace International employee handbook contained promises of specific treatment that modified the employment relationship, relying on an equitable theory of recovery that was first recognized by our Supreme Court in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984). In *Thompson,* the court held that promises of specific treatment in specific situations, contained in employee handbooks, may limit an employer's right to discharge an at-will employee:

> Independent of this contractual analysis, however, we hold that employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees. When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employ-

ees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule.

However, absent specific contractual agreement to the contrary, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship. Thus, the employer's reason for unilaterally issuing an employee policy manual or handbook, purporting to contain the company policy vis-à-vis employee relations, becomes relevant.

*Thompson*, 102 Wn.2d at 229. Because employers issue such handbooks principally to create an atmosphere of fair treatment and job security for their employees, the court concluded that if an employee is induced to continue working by assurances contained in a handbook or manual, the assurances become enforceable components of the employment relationship. *Id.* at 230.

In the instant case, Terry's employment agreement states that his employment is terminable "at the will of either the Company or" himself. Clerk's Papers (CP) 1072. This language is unambiguous and clearly limits an employee's expectation of job security. Moreover, as discussed above, the provision governed the entire employment relationship. The provision itself contains no qualifications and is in no way limited in application. Given his acknowledgement of this provision, Terry could not have had any reasonable expectation that the handbook granted him the right to be discharged only for cause or claim that his reliance on contrary provisions was justifiable. Under these facts, we conclude that the express statement in the agreement was

sufficient to remove the issue of the handbook's effect on the employment relationship from the jury's consideration.[2]

Tortious Interference Claim

■ The Raymonds next claim that the trial court erred in dismissing their claim that the defendants wrongly interfered with his posttermination employment opportunity with Wesmar. A claim for tortious interference with a business expectancy requires: (1) the existence of a valid business expectancy; (2) knowledge by the defendants of that expectancy; (3) intentional interference inducing or causing a breach or termination of the expectancy; (4) that the defendants interfered for an improper purpose or by improper means; and (5) resulting damage. *See Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

The Raymonds contend that dismissal of their claim was inappropriate because a jury could infer that Pacific Chemical's threat to enforce the noncompetition covenant was improper if the covenant was invalid, citing *Kieburtz & Assocs., Inc. v. Rehn*, 68 Wn. App. 260, 842 P.2d 985 (1992). In *Kieburtz*, an employer sued two employees for tortious interference after they solicited work for their own sepa-

---

[2]Pacific Chemical further contends that the existence of the written agreement forecloses any *Thompson* inquiry into the application of an equitable theory of recovery, citing *St. Yves v. Mid State Bank*, 111 Wn.2d 374, 757 P.2d 1384 (1988), *overruled in part by Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990), for support. In *St. Yves*, the court held that the parol evidence rule precluded consideration of an employee manual to vary the terms of a later written contract that was unambiguous. *Id.* at 380. Contrary to the defendants' assertions, the case does not support the proposition that the existence of a written agreement always precludes an equitable theory of recovery. Our Supreme Court addressed this argument in *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 826 P.2d 664 (1992). In *Swanson*, the plaintiff relied on a written memorandum guaranteeing working conditions, which the defendant issued after its employees threatened to seek union representation and after extensive negotiations had taken place. In opposing the claim, the employer attempted to give conclusive effect to a disclaimer in its employee benefits manual that was issued to the plaintiff at the beginning of his employment. The court held that under those circumstances, the earlier disclaimer did not trump any later modification of the employment relationship, stating that all of the circumstances and the employer's representations and practices should be examined to determine the effect of the written provision. *See id.* at 531-35. The facts are in no way similar to the situation in the instant case, as there is no indication that Pacific Chemical issued its handbook in response to a threat of employee unrest.

rate business from one of the employer's clients. In reversing the trial court's dismissal of the claim, we held that a jury could reasonably conclude that the employees' actions violated a duty of loyalty to their employer and thus were taken for an improper purpose or using improper means. *Id.* at 267. The claim of tortious interference was not based on the defendants' assertion of contractual rights and, thus, is distinguishable.

■ In the instant case, even if the restrictive covenant were invalid, Pacific Chemical's good faith assertion of its legal interests would not constitute improper interference. *See Leingang*, 131 Wn.2d at 157; *see also Dauphin v. Smith*, 42 Wn. App. 491, 495, 713 P.2d 116 (1986). Absent any evidence that the company attempted to enforce the covenant in bad faith, Pacific Chemical's assertion of a legally protected interest does not constitute tortious interference. *See Leingang*, 131 Wn.2d at 157. Although the Raymonds alleged that Pacific Chemical improperly terminated Terry's employment on the basis of his age, they voluntarily nonsuited that claim before they filed this appeal. Thus, no cause of action remains in this suit to support the claim of tortious interference. We conclude that the trial court did not err in dismissing the claim.

Age Discrimination Claim

■ The Raymonds also argue that the trial court erred in dismissing their age discrimination claims against Terry Raymond's supervisors and managers. The individual defendants respond that this claim is moot because the Raymonds voluntarily nonsuited their age discrimination claim against Pacific Chemical, contending that any ruling on the issue of individual liability for the claims would be advisory and inappropriate. The Raymonds' claim against the individual defendants, however, is not based on the liability of Pacific Chemical for any of the allegedly discriminatory acts. Rather, the Raymonds argue that the state law against discrimination provides an independent cause of action against individual supervisors and managers who commit age discrimination. This claim does not depend upon the

presence of claims against Pacific Chemical. Thus, we find that the issue is not moot.

Washington's Law Against Discrimination, RCW 49.60, recognizes the right of citizens to be free from various forms of discrimination and establishes a state agency to eliminate and prevent discrimination in employment, credit and insurance transactions, public accommodation, and real property transactions. RCW 49.60.010, .030(1); *see Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 673, 807 P.2d 830 (1991). It also creates a private cause of action to address discriminatory conduct.

> Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601 et seq.).

RCW 49.60.030(2).

The act defines unfair employer practices to include discrimination in hiring, discharge, compensation, and other terms or conditions of employment. RCW 49.60.180. Under the act, "employer" is defined as "any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons" excluding any religious or sectarian organization that is not organized for private profit.[3] RCW 49.60.040(3).

In *Griffin v. Eller*, 130 Wn.2d 58, 922 P.2d 788 (1996), the court held that an employee could not maintain sexual

---

[3]The act further defines "person" to include

"one or more individuals, partnerships, associations, organizations, corporations, cooperatives, legal representatives, trustees and receivers, or any group of persons; [and] any owner, lessee, proprietor, manager, agent, or employee, whether one or more natural persons; and further . . . any political or civil subdivisions of the state and any agency or instrumentality of the state or of any political or civil subdivision thereof[.]" RCW 9.60.040(1).

harassment and retaliation claims against her employer under RCW 49.60 because she was the only full-time employee. The court concluded that the definition of an employer in RCW 49.60.040(3) exempted small employers from civil liability under the act. *Id.* at 63-64; *accord Anaya v. Graham*, 89 Wn. App. 588, 950 P.2d 16 (1998). The court upheld this exemption against an equal protection challenge, reasoning that the provision advances the legitimate state purpose of protecting small businesses from the expense of private litigation. *Griffin*, 130 Wn.2d at 66-70.

In the instant case, the Raymonds argue that the law permits suits against individual defendants for discriminatory discharge even though, under *Griffin*, such defendants would not be liable for the same acts if they worked for a company with fewer than eight employees. In light of the claims that have been asserted in this case, we hold that the trial court did not err in finding that the individual supervisory or managerial employees could not be held personally liable under the act.

The Raymonds' age discrimination claims against the Pacific Chemical managers are based on the changes in Terry's compensation package and his termination by the company, the type of actions that managers must necessarily take on behalf of their employer. The claims thus do not arise out of the managers' own acts or avoidable or unnecessary conduct, but are based on their performance of their management duties. As the California Supreme Court has noted, unlike claims based on harassment, a manager may not be able to insulate him or herself from a claim alleging a discriminatory discharge.

> No supervisory employee needs to use slurs or derogatory drawings, to physically interfere with freedom of movement, to engage in unwanted sexual advances, etc., in order to carry out the legitimate objectives of personnel management. . . . An individual supervisory employee cannot, however, refrain from engaging in the type of conduct which could later give rise to a discrimination claim. Making personnel decisions is an inherent and unavoidable part of the supervisory function.

Without making personnel decisions, a supervisory employee simply cannot perform his or her job duties.

*Reno v. Baird*, 18 Cal. 4th 640, 646, 957 P.2d 1333, 1336, 76 Cal. Rptr.2d 499 (1998). Although in some cases, individual supervisors may engage in personal acts of age discrimination or a plaintiff may allege such harassment as a component of a constructive discharge claim, *see Baird*, 957 P.2d at 1348-49 (Mosk, J., concurring), there is no such allegation here.

If, as the Raymonds urge, RCW 49.60 extends liability to individual defendants for acts within the scope of their managerial duties and committed as a necessary part of their performance of those duties, then the employer exemption from liability for those same acts, recognized in *Griffin*, would not make sense. As noted by one federal court examining the issue of individual liability under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634,

> it would be incongruous to hold that the ADEA does not apply to the owner of a business employing, for example, ten people, but that it does apply with full force to a person who supervises the same number of workers in a company employing twenty or more. . . . Such personal liability would place a heavy burden on those who routinely make personnel decisions for enterprises employing twenty or more persons[.]

*Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994).

Analogous federal statutes prohibiting age discrimination use a similar liability scheme that defines "employer" to include any agent of the employer. Under the ADEA, the term "employer" includes "a person engaged in an industry affecting commerce who has twenty or more employees" and also "any agent of such a person[.]" 29 U.S.C. § 630(b) (noting exclusions); *see also* 29 U.S.C. § 630(a) (defining "person"); *cf. United States Equal Employment Opportunity Comm'n v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279-80, 131 A.L.R. FED. 665 (7th Cir. 1995) (noting that

Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act define "employer" similarly and are treated the same for the purpose of analyzing the issue of individual liability under the acts). Although their analysis does not control our result here, we note that all federal circuits examining the issue of individual liability under the ADEA have concluded that the act does not create personal liability for individual defendants. *See Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999) (dicta); *Stults v. Conoco, Inc.*, 76 F.3d 651 (5th Cir. 1996); *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 52 n.2 (7th Cir. 1995) (dicta); *Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583 (9th Cir. 1993).

For the reasons discussed above, we conclude that the trial court did not err in dismissing the Raymonds' claims under RCW 49.60 against Terry's Pacific Chemical supervisors. We note that our decision does not address the issue of individual liability for other violations of the act.[4]

Request for a Declaratory Judgment

The Raymonds finally contend that the trial court erred in denying its request for a declaratory judgment finding that the noncompetition covenant was invalid as a matter of law. They argue that the issue is relevant both to their claim of tortious interference and to any determination of damages. In light of our decision that the trial court did not err in dismissing the Raymonds' claims, we conclude that the issue of the covenant's validity is moot.

We affirm.

WEBSTER and BAKER, JJ., concur.

---

[4]Thus, our decision is not inconsistent with the holding in *Brown v. Scott Paper Worldwide Co.*, 98 Wn. App. 349, 989 P.2d 1187 (1999). *Brown* addressed the issue of statutory liability for the personal acts of individual defendants and does not address the issue raised in the instant case.